Barbara Enloe Hadsell, Esq. [S.B. #086021]
Dan Stormer, Esq. [S.B. #101967]
David Clay Washington, Esq. [S.B. #305996]
Hanna Chandoo, Esq. [S.B. #306973]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: bhadsell@hadsellstormer.com
        dstormer@hadsellstormer.com
        dwashington@hadsellstormer.com
        hchandoo@hadsellstormer.com

Attorneys for Plaintiffs
JOEL STALLWORTH, TAMIYA DICKERSON,
and Minor Plaintiff S.S.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOEL STALLWORTH, TAMIYA DICKERSON, and Minor Plaintiff S.S.<br><br>Plaintiffs,<br><br>v.<br><br>NIKE RETAIL SERVICES, INC., WENDY MAGEE, NIKE, INC., and DOES 2-10,<br><br>Defendants. | Case No.: 2:20-cv-05985-VAP (GJSx)<br><br>[Assigned to the Honorable Virginia A. Phillips – Courtroom #8A]<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES**<br><br>1.  42 U.S.C. § 1983 – Unlawful Detention and False Arrest and Imprisonment<br>2.  42 U.S.C. § 1981 – Deprivation of Equal Rights Under The Law<br>3.  42 U.S.C. § 1985 Deprivation of Rights and Privileges<br>4.  Cal. Civ. Code § 51.5 – Unruh Act<br>5.  Cal. Civ. Code § 51.7 – Ralph Act<br>6.  Assault<br>7.  Intentional Infliction Of Emotional Distress<br>8.  Cal. Civil Code § 46 – Slander<br>9.  False Imprisonment<br>10. Negligent Supervision And Retention<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.     Black America is yearning for corporate responsibility. As the historic protests from LA to London make clear, the world is awakening to the reality that America is far too often a hostile place for Black families. Nike's clever marketing intended to profit from Black America's desire for equal treatment can only go so far to cover up the reality that is Nike's problematic culture. From its all-white executive leadership,[1] to a history of Nike employees siccing the police on innocent Black customers,[2] to Nike's failure to address this particular manager's history of racist behavior—Nike bears full responsibility for the horrifying and deeply embarrassing ordeal it put this family through. And the longer Nike refuses to meaningfully address, atone for, and rectify its wrongs, the more the Stallworth-Dickerson family suffers in knowing that even at Nike, their humanity is dispensable.

**PARTIES**

**Plaintiffs**

2.     Plaintiff Joel Stallworth is a 37-year-old African American man who owns a design and retail business in downtown Los Angeles and is married to Plaintiff TaMiya Dickerson. Plaintiff Joel Stallworth is a citizen of the state of California.

3.     Plaintiff TaMiya Dickerson is a 43-year-old African American woman who is a Partner at Ernst & Young Global Limited and is married to Plaintiff Joel Stallworth. Plaintiff TaMiya Dickerson is a citizen of the state of California.

---

[1] At the time of the incident and at the time this lawsuit was filed, Nike, Inc.'s Executive Leadership was comprised of seven white men and three white women. Attached hereto as Exhibit 1 is a screenshot of Nike, Inc.'s Executive Board as displayed on Nike, Inc.'s website on June 9, 2020. On information and belief, at all times relevant herein, Nike, Inc.'s Board of Directors exercised control over policies, practices, procedures, trainings, and protocols regarding employees of Defendant Nike Retail.
[2] One year before Nike Retail's employee, Defendant Wendy Magee, called the police on the Stallworth-Dickerson family, the very same thing happened to Fernando Stenseth, who was followed and detained by police outside Nike's downtown Portland store based on a false accusation by a Nike employee. Attached hereto as Exhibit 2 is a June 22, 2018 article from *The Oregonian* which, at page 9, describes the racial profiling of Mr. Stenseth.

THIRD AMENDED COMPLAINT
FOR DAMAGES
    - 1 -

4.    Plaintiff S.S. is the 2-year-old child of Plaintiffs Joel Stallworth and TaMiya Dickerson. Plaintiff S.S. is a citizen of the state of California.

**Defendants**

5.    At all times material herein, Defendant Nike Retail Services, Inc. ("Nike Retail" herein) has been a corporation that is incorporated and headquartered at 1 SW Bowerman Dr., Beaverton, Oregon, 97005-0979, and doing business in California at various locations including the Nike Store located at 395 Santa Monica Place, Santa Monica, CA 90401.  Defendant Nike Retail is a citizen of the state of Oregon, which is also its principal place of business. Defendant Nike Retail is a wholly owned subsidiary of Nike, Inc., which is a California registered business and a corporation with the same Oregon address and citizenship as Defendant Nike Retail. As used herein, the term "Nike" refers collectively to Defendant Nike Retail *and* its parent company, Nike, Inc.

6.    At all times material herein, Defendant Wendy Magee was the manager at the Nike Store located at 395 Santa Monica Place, Santa Monica, CA 90401.

7.    At all times material herein, Defendant Nike, Inc. has been a corporation that is incorporated and headquartered at 1 Bowerman Dr., Beaverton, Oregon 97005. Defendant Nike, Inc. is a citizen of the state of Oregon, which is also its principal place of business. Nike Retail is a subsidiary of Defendant Nike, Inc. Defendant Nike, Inc. is a registered business in California.

8.    The true names of Doe Defendants 2 through 10, inclusive, are presently unknown to Plaintiffs, who therefore sue each of these Defendants by such fictitious names. Upon ascertaining the true identities of the Doe Defendants, Plaintiffs will amend this Complaint for Damages, or seek leave to do so, by inserting the true names in lieu of the fictitious names. Plaintiffs are informed and believe, and on the basis of such information and belief allege, that Defendants Magee, Nike Retail, Nike, Inc., and each Doe Defendant is in some manner legally responsible for the acts, omissions, injuries and damages herein alleged.

9.    On information and belief, each Defendant is the agent, alter-ego, co-

1    conspirator, joint-venturer of the other and each ratified the acts and failures to act of the

2    others.

3    ## JURISDICTION AND VENUE

4    10.    This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331,

5    1332, 1343, and 1367 and 42 U.S.C. §§ 1981, 1983, 1985, and 1988. This action is

6    authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil

7    Rights Act of 1964, as amended), Section 102 of the Civil Rights Act of 1991, and the

8    Civil Rights and Enforcement Acts of 1866 and 1871.

9    11.    The amount in controversy exceeds $75,000.

10    12.    Venue is proper in the United States District Court for the Central District of

11    California pursuant to 28 U.S.C. § 1391 because the unlawful conduct alleged herein was

12    committed within the boundaries of the Central District of California.

13    ## BACKGROUND AND FACTUAL ALLEGATIONS

14    13.    On July 5, 2019 husband and wife Joel Stallworth ("Mr. Stallworth"),

15    TaMiya Dickerson ("Ms. Dickerson"), and their infant son S.S. went to the Nike Store

16    located at 395 Santa Monica Place, Santa Monica, CA 90401. It wasn't happenstance that

17    they chose to patronize Nike—they felt a deep connection to the brand.[3] That connection

18    disintegrated when they were chased, harassed, and accosted by Wendy Magee, Nike

19    Retail's store manager. With the color of their skin as "evidence," Magee ran after the

20    family, accused them of theft, and lunged at Mr. Stallworth in an attempt to snatch his

21    nineteen-month-old son's first basketball from Mr. Stallworth's hands. As if she hadn't

22    traumatized this family enough, Magee then enlisted three armed Santa Monica Police

23    Department officers—at least one of whom was a proven killer[4]—to surround, detain,

24

25    [3] Attached hereto as Exhibit 3 are a series of pre-incident photos, dating back over a
decade, showing this family's commitment to Nike before Nike devalued their lives.

26    [4] A February 2020 investigation found that a year before the subject incident, Jacob
Emanuel, one of the officers enlisted by Nike Retail to detain the Stallworth-Dickerson

27    family, killed Eric Rodriguez. Emanuel placed Mr. Rodriguez, who was unarmed, on his
stomach with his hands cuffed behind his back and his legs hobbled, a widely maligned

28    tactic that can severely restrict breathing.

THIRD AMENDED COMPLAINT
FOR DAMAGES                                    - 3 -

and intimidate the family and demand proof that they hadn't stolen the ball.

14.     The officers had no problem touching their guns and telling Mr. Stallworth to "calm down" and "stop intimidating" Magee. And when this family went back into the Nike Store to process the return of the ball and rid themselves of the traumatic memento, the officers continued to surround and intimidate them until the family left in shame and humiliation. Mr. Stallworth and Ms. Dickerson, whose careers rely on their reputations, were forced to upload video of the incident to protect their public image, which they feared would be destroyed if one of the many gawking onlookers, or worse, Nike, uploaded a video and distorted the narrative. The Stallworth-Dickerson video garnered millions of views and dozens of news stories, with Nike roundly condemned for its actions. The Stallworth-Dickerson family was and remains deeply traumatized by how close they came to becoming names on a protest sign.

15.     The indelible trauma brought upon this family resulted directly from Nike's failure to adequately train, supervise, and discipline its employees, favoritism in Nike's ranks, Nike's fraudulent "anonymous" employee reporting system, Magee's decision to follow her own racial biases, and the Santa Monica Police Department's failure to exercise independent judgment when confronted with the bogus and racist allegations of Nike Retail's out-of-control employee.

16.     The Santa Monica Police Department, operating in and around the Third Street Promenade, maintains an agreement with shopkeepers whereby its officers detain

_____

The DA memorandum is totally silent as to Emanuel's position on Rodriguez's body while he subdued him as well as the amount and type of force he applied. It is also totally silent as to the source of various contusions found on Rodriguez's face. Indeed, the memorandum is so sparse in facts that if Emanuel had done to Rodriguez exactly what Derek Chauvin did to George Floyd, it would contradict nothing in the memorandum. Attached hereto as Exhibit 4 is the February 10, 2020 Memorandum of Los Angeles County District Attorney Jackie Lacey's Justice System Integrity Division regarding the April 7, 2018 death of Mr. Rodriguez.

Counsel for the Stallworth-Dickerson family believes that counsel's investigation of this incident, alongside the investigations of organizers and nonprofits, and any and all evidence obtained therefrom will be admissible at trial to show the actual danger that the Stallworth-Dickerson family was placed in by Nike.

THIRD AMENDED COMPLAINT
FOR DAMAGES
                                        - 4 -

any and all individuals shopkeepers accuse of theft or against whom shopkeepers make
citizens arrests or detentions. This agreement substitutes the judgment of private parties
for the SMPD's own authority as SMPD simply carries out the shopkeepers' directions.

17.    Nike could have prevented this. Magee has a history of degrading and racist
behavior while working at Nike Retail. She persistently racially profiled employees and
customers of color, even ordering employees to stalk NBA champion power forward
Tristan Thompson as he browsed apparel. Magee was known for using racial code
language, frequently radioing "Keep an eye on the VIP customers" to refer to Black
customers whom she wanted her employees to follow around the store. Even more
degrading, Magee conducted searches of Black employees at the ends of their shifts in
which she required them to remove their outerwear and turn it inside out. She also
questioned Black employees' financial capacity to purchase Nike products, even with
their employee discounts, and refused to allow Black employees to purchase items unless
she herself processed their transactions.[5] Nike's widely-maligned[6] "anonymous"[7]
employee reporting hotline likely contributed to the suppression of some employee
voices, but not all. Remarkably, multiple employees were brave enough to call the hotline
or to otherwise submit complaints which alerted Nike, Inc. and Nike Retail to Magee's

---

[5] Magee's behavior bears a striking resemblance to the allegations leveled against Nike
Retail by its Chicago NikeTown employees in a case that resulted in a $7,600,000
settlement. Attached hereto as Exhibit 5 are (1) the Third Amended Complaint in that
case, *Smith v. Nike Retail Services Inc.*, with relevant allegations at paragraphs 45-48
and (2) a July 31, 2007 article from *The Chicago Tribune* discussing the settlement
agreement.

[6] Nike's hotline is the subject of a 2018 lawsuit wherein it was revealed that human
resources complaints had dropped precipitously (by 27%) over a single year, indicating a
total loss of faith by employees in the human resources department. Attached hereto as
Exhibit 6 is a November 30, 2018 article from the *Portland Business Journal* describing
the class action lawsuit which, *inter alia*, "alleges the third-party vendor who operated
Nike's anonymous hotline also presented information to board members that showed the
company's employees used the hotline far less than employees at peer companies,
including a 'shocking' 27 percent decrease in the use of the hotline in fiscal 2016."

[7] Though the hotline was marketed to employees as anonymous, it was not anonymous at
all. Calls made to the hotline were routinely communicated to the manager of the store
from which the complaint was made, including the name of the employee who made the
complaint.

racist behavior as early as 2017. Moreover, an African American employee who assisted in processing Mr. Stallworth's return of the basketball after the subject incident specifically told Ms. Dickerson and Rebecca, "She does this all the time. She has done it multiple times today. As a Black man, I know what it feels like."

18.    The Code of Conduct provided to employees of Defendant Nike Retail advises employees to use the hotline and that the company "takes all allegations of misconduct or other wrongdoing seriously and will investigate them thoroughly." On information and belief, the employees who complained about Magee's racist harassment of customers and employees of color did so at least in part pursuant to this Code of Conduct. Attached hereto as Exhibit 7 is a copy of the Code of Conduct. This document is just one example of how Nike, Inc. exercises sufficient control over Nike Retail. For example, it opens with a welcome statement from Ann Miller, Nike, Inc.'s Chief Ethics and Compliance Officer. It also repeatedly refers to Nike, generally, as one family and one company. And the "Speak Up Portal" referenced in the Code appears to be used by and available to all of Nike's subsidiaries.

19.    As a result of these complaints, Nike knew or should have known that hiring and/or retaining Magee created a particular risk that Magee would engage in the tortious and illegal conduct alleged herein. This is so because pursuant to Defendant Nike's own policies on investigating complaints of wrongdoing, Magee's supervisors knew or should have known of the same beginning at least two years before the incident that is the subject of this lawsuit. These supervisors include a Chief Human Resources Officer, two successive Directors of Diversity and Inclusion, a Global Employee Relations Director, a Vice President and General Manager for Los Angeles and West Territory, Regional District Directors, a Regional Store Director, District Loss Prevention Managers, as well as numerous Nike Store Lead Managers.  Each of these individuals were in supervisorial positions over Magee and had, or at a minimum should have had, prior knowledge of her propensity to engage in the wrongdoing alleged herein.

20.    For at least two years prior to this incident, Nike was repeatedly made aware

of Magee's racist and degrading behavior toward employees and customers. Instead of supporting its Black employees, Nike Retail praised Magee: Nike Retail's District Loss-Prevention Manager even sent out an internal memo giving her a "high five" for her "loss prevention" efforts.

21.    Despite repeated notice of McGee's racially biased and motivated conduct, Defendant Nike failed and refused prior to the incident alleged herein to: provide any or adequate training to McGee regarding anti-bias, anti-racism and racial profiling policies, practices and procedures or to enforce any such training given; adequately investigate complaints made by employees and/or customers regarding McGee's conduct; adequately monitor and supervise her; adequately ensure that employees who made complaints concerning McGee's conduct were not retaliated against; embark on corrective action and disciplinary measures regarding her, up to and including termination; or to take other measures to adequately protect employees and members of the public from McGee's unlawful, racially biased and motivated conduct.

22.    In an attempt to save its public image, Nike Retail fired Magee after the incident. Magee then filed a wrongful termination lawsuit against Nike Retail, alleging that "Nike fired Ms. Magee because she is Caucasian."[8] She described the Stallworth-Dickerson family as "aggressive," and stated, "Far from being a racial profiler … Ms. Magee has a child who is half African-American, and she is engaged to a Mexican-American." In a predictable maneuver, Nike Retail maintains that it only terminated Magee because her actions "were in violation of established Nike policy, which prohibits Nike employees to leave the store to pursue customers because of a belief they may have stolen Nike property." In other words, according to Nike Retail, Magee's history of egregiously racist behavior and her decision to enlist armed police to intimidate this Black family *played no role* in Nike Retail's decision to terminate her. Nothing could provide a clearer sign to Nike's Black customers and employees that Nike is uninterested

---

[8] It is unclear whether Magee alleges she was discriminated against because of an ancestral link to the Caucasus mountains of Russia or is using the word "Caucasian" to mean "white," aware or unaware of the word's decidedly racist history.

in their safety and wellbeing.

23.    Despite Nike's clear notice of Magee's racism, and despite the undeniable

trauma that Nike brought upon this family, Nike made no meaningful attempt to atone for

its actions. Rather, Ms. Dickerson received a single email and call from Blanca Gonzalez,

Nike Retail's Los Angeles Operations Manager. Gonzalez spoke with Ms. Dickerson

briefly, telling Ms. Dickerson that she was on vacation and would call her back after she

returned to the country. Gonzalez never called back. Instead, Nike Retail sought to bury

the bad news: Yelp reviews left by Ms. Dickerson and Mr. Stallworth were reported and

removed.[9]

24.    Nike has added itself to the list of perpetrators in an "increasing number of

scenarios" reflecting the long history of white people calling the police on innocent Black

people and perpetuating terror on the Black community, as such behavior often "result[s]

in arrests, interrogation, and violence against Black people."[10] America is awakening to

this reality, but Nike, for all its earnings-focused lip service, has yet to show that it is on

board with the movement for equality. Neither this family's deep, decades-long

professional connection with Nike, nor this family's remarkable community standing, nor

even displays of solidarity by Mandy White,[11] a Nike-sponsored athlete and daughter of

Jordan brand senior Vice President Howard White, were enough to get Nike to care about

the harm it has caused.

25.    On Friday, June 5, 2020, cornered by the racist reality that America has

_____

[9] Attached hereto as Exhibit 8 are the emails received by Mr. Stallworth and Ms.
Dickerson notifying them of the deletion of their Yelp reviews and the purported reasons
therefor.

[10] Attached hereto as Exhibit 9 is a *Vox News* article discussing, in the wake of the May
25, 2020 Central Park incident involving Franklin Templeton VP Amy Cooper, the
disturbing pattern of white people enlisting armed police to harass and harm innocent
Black people.

[11] Shortly after the incident, Ms. White posted her sadness about the incident on social
media and posted a picture of herself wearing the very same sweatshirt—which was
designed by Mr. Stallworth—that Mr. Stallworth was wearing at the time of the subject
incident. Attached hereto as Exhibit 10 are two social media posts by Ms. White
exhibiting the same.

1    shown it can no longer ignore vis-à-vis the worldwide Black Lives Matter movement

2    inspired by the horrific murder of George Floyd, Nike, Inc. Chief Executive Officer John

3    Donahoe sent an open letter to all Nike employees, including those employed by

4    subsidiaries such as Nike Retail, stating, "our most important priority is to get our own

5    house[12] in order … we have a long way to go. … We can't simply go back to 'normal,'

6    because the normal we knew a week ago, a month ago, a year ago, isn't acceptable—not

7    for far too many of us."[13]

8         26.    Nike's "normal" could have cost the Stallworth-Dickerson family its life.

9    Nike's "normal" never cared about Black and Brown lives nor the systemic reasons for

10   which they are endangered. Nike only cares about their wallets. Nike has made that much

11   clear in the discord between its profitable advertising and its private

12

13

14

15

16

17

18

19

20

21

22

23

24   _____
     [12] It is unclear whether Donahoe considers Nike, Inc.'s international factories to be its
25   "own house" with respect to the systemic oppression of Black and Brown people. *See*
     Exhibit 11 (2017 *The Guardian* article describing 500 workers fainting in a single year
26   due to excessive hours in 99-degree heat at four Nike, Inc. factories, none of which paid
     a living wage).
27   [13] Attached hereto as Exhibit 12 is Nike, Inc. CEO John Donahoe's Open Letter to Nike
     employees in response to the transformative Black Lives Matter protests that have
28   shaken the nation over the past five weeks.

THIRD AMENDED COMPLAINT
FOR DAMAGES                          - 9 -

behavior.[14][15][16][17]

_____

[14] Attached hereto as Exhibit 13 is a September 5, 2019 *Fast Company* article regarding the one year anniversary of Nike, Inc.'s Kaepernick advertisement, stating, "Poetic posturing aside, the brand still fell short for athletes like Allyson Felix, who was forced to leave the brand over its pregnancy policy. Meanwhile, despite the success of having Kaepernick as the centerpiece of last year's campaign, the brand hasn't really utilized the unemployed QB since—unless you count the time he saved them from putting a problematic flag on a special-edition sneaker." Nike's profit grew by six billion dollars as a result of the Kaepernick ad. Attached hereto as Exhibit 14 is a September 5, 2018 *The Atlantic* article explaining, "For Nike, Kaepernick's cause is simply good business—if it were anything other than a cynical branding exercise, the company would surely not be simultaneously doing business with the NFL, which has done its best to stifle Kaepernick's protest movement."

[15] Nike, Inc.'s "commitment," *vis-à-vis* the Donahoe *open* letter (Exhibit 12), to donate $40 million dollars "to the Black community" over the next four years in the wake of the George Floyd protest is, in effect, another advertisement. The $40 million over four years amounts to less than 0.025% (one fortieth of one percent) of Nike's annual revenue. To put this in perspective, it is the equivalent of $7.02 to a Nike Store sales associate, based on the associate's $28,080 annual income ($13.50/hour). Most importantly, Nike, Inc.'s act of publishing Donahoe's letter as "open" functions as an advertisement, likely recouping this "donation" and then some.

[16] Attached hereto as Exhibit 15 is an April 28, 2018 *New York Times* article discussing a toxic and misogynistic work environment at Nike, Inc.'s executive headquarters, including the following:

> There were the staff outings that started at restaurants and ended at strip clubs. A supervisor who bragged about the condoms he carried in his backpack. A boss who tried to forcibly kiss a female subordinate, and another who referenced a staff member's breasts in an email to her.
>
> Then there were blunted career paths. Women were made to feel marginalized in meetings and were passed over for promotions. They were largely excluded from crucial divisions like basketball. When they complained to human resources, they said, they saw little or no evidence that bad behavior was being penalized.

[17] Nike, Inc.'s billion-dollar lifetime deal with soccer star Cristiano Ronaldo is Nike, Inc.'s (and the world's) biggest endorsement contract. When Kathryn Mayorga's contemporaneously-corroborated violent anal rape allegations came out against Ronaldo (with hospital records, a police investigation, and DNA confirmation), Nike, Inc. did nothing. In fact, just three months after Mayorga's civil case was mandated to confidential arbitration, Nike, Inc. released a new Ronaldo ad campaign. Attached hereto as Exhibit 16 are four articles: Germany's *Der Spiegel* (Sept. 29, 2018) (describing the grisly details of the alleged rape); *BBC News* (Oct. 4, 2018) (describing Nike, Inc.'s PR team expressing "deep concern" about the allegations), *Fox Business* (Oct. 21, 2019) (describing additional unearthed details and corroboration of the alleged rape), and *Sports Illustrated* (Feb. 6, 2020) (describing the confidential arbitration order). Attached hereto as Exhibit 17 is a screenshot of Nike, Inc.'s May 17, 2020 Cristiano Ronaldo Instagram advertisement and a screenshot of Nike, Inc.'s Cristiano Ronaldo product line as displayed on Nike, Inc.'s website on June 22, 2020.

THIRD AMENDED COMPLAINT FOR DAMAGES

- 10 -

27.    Nike has a decades-long relationship with Wieden+Kennedy advertising agency, the agency that created its Colin Kaepernick ad campaign. It was that ad campaign which drew Ms. Dickerson toward the company. Nike began its relationship with Wieden+Kennedy advertising agency in 1988 when Dan Wieden proposed to Nike executives that they use the now-ubiquitous slogan, "Just Do It." The fact that Wieden+Kennedy's "Just Do It" was inspired by the last words of a man at his execution was (and remains) of no consequence to Nike.[18] Evidently, neither does Wieden+Kennedy's 2018 promotion of Jason Kreher to Creative Director overseeing the firm's Entertainment and Editorial Divisions, despite his history of offensive content in his tweets and his 2015 published book of "jokes," including "Why did the policeman arrest the hippo? Because he was black."[19]

28.    As Nike's profits from the Black community, the conspicuous absence of *any* Black representation in its Executive Leadership at all times relevant herein (not to mention the fact that only 4.8% of Nike's 4,689 directors are Black) is hard to ignore. Equally hard to ignore is the suffering that Nike has brought upon this family. Nike should follow the advice of its own George Floyd ad campaign: "Don't turn your back on racism. Don't make any more excuses."

29.    Plaintiffs are informed and believe and thereon allege that at all times relevant herein, Defendants and each of them were the agents, employees, servants, joint venturers, partners, and/or co-conspirators of the other Defendants named in this Third Amended Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

---

[18] Regarding Nike, Inc.'s death-penalty-inspired slogan, Liz Dolan, Nike, Inc.'s former Chief Marketing Officer, told the *Washington Post*, "It was sort of a funny thing inside the company." Attached hereto as Exhibit 18 is a *Washington Post* article describing Nike, Inc.'s capital-punishment-inspired slogan.
[19] Attached hereto as Exhibit 19 is a series of racist, homophobic, and antisemitic tweets by Wieden+Kennedy Creative Director Jason Kreher. Attached hereto as Exhibit 20 are a series of racist, misogynistic, and hateful jokes from a book published by Jason Kreher. Attached hereto as Exhibit 21 is an *AdAge* article showing Kreher's award for "2018 Creative Director of the Year."

30.     Plaintiffs are informed and believe, and thereupon allege, that at all times material herein, each of the Defendants was the agent, alter ego, or employee of, and/or working in concert with, his/her co-Defendants and was acting within the course and scope of such agency, employment, and/or concerted activity. Plaintiffs allege that to the extent certain acts and omissions were perpetrated by certain Defendants, the remaining Defendant or Defendants confirmed and ratified said acts and omissions.

31.     Whenever and wherever reference is made in this Third Amended Complaint for Damages to any act or failure to act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and severally.

**A.     The Stallworth-Dickerson Family Has a Generational History of Success and Is Particularly Susceptible to the Trauma Brought Upon Them by Nike**

32.     As America awakens to the deep roots of institutional racism which thread through the very power structures that undergird Nike's corporate history and all-white executive leadership at all times relevant herein, the story of this remarkable family represents generational success at least as much as Mr. Stallworth and Ms. Dickerson's life experiences reflect generational trauma.

**i.     Mr. Stallworth**

33.     Mr. Stallworth was born the eighth of ten children in Stockton, California in 1983. He was a gifted athlete from a young age. Basketball was in his blood and it is integral to his identity: His father, Richard, is a Stockton basketball legend and was a Division I forward at Saint Louis University. Basketball was Mr. Stallworth's safe haven, as practices kept him sheltered from the dangers of East Stockton. The indispensability of basketball to the Stallworth family identity is particularly on display in the Stallworth annual family reunion basketball tournament, which rotates back and forth between Oklahoma and California each year. It is a time for the Stallworth men to come together and bond over the sport that runs in their blood. Mr. Stallworth and his brother Aaron keep the tradition alive in Stockton in other ways, too, by coming together for local

celebrity exhibition basketball games to raise money and awareness for the "Gun Down"
antiviolence movement.[20]

34.    It is a tradition that dates back to Mr. Stallworth's childhood, as he grew up
playing basketball with his father and uncles. Every day when his father came home from
work, they would shoot hoops together. Richard was also a regular at Mr. Stallworth's
high school games, and as Richard was a local basketball legend, Mr. Stallworth
cherished his dad's support. With his father's presence and tutelage, Mr. Stallworth made
the All-County First Team as a high schooler at Samuel Hancock High, a school founded
by his grandfather Bishop Lewis. He was a versatile player, filling the small forward,
power forward, and center positions as needed.

35.    Perhaps the greatest testament to Mr. Stallworth's family connection to
basketball is the fact that the entire starting five of his junior and senior basketball teams
at Samuel Hancock High School was comprised exclusively of his family members: Mr.
Stallworth, his brother Aaron, and his cousins Maurice, Brian, and Michael. Game nights
were thus a decidedly family affair, as the stands were as packed with family as the roster
itself.

36.    When Mr. Stallworth graduated from high school, he was recruited to play
basketball San Joaquin Delta College, where he attended and played for two years. After
earning his associate degree, Mr. Stallworth transferred to California State University –
Stanislaus' ("CSUS"). Mr. Stallworth was determined to play basketball at CSUS, and he
made the team as a walk-on, filling the small forward, power forward, and center
positions just as he had in high school. It didn't take long for his coach, Keith Larson, to
see how talented Mr. Stallworth was. After one season, Larson offered him a full athletic
scholarship and named him Team Captain. Coach Larson made the right call, as Mr.
Stallworth went on to lead the team in rebounds, points, or both in 22 of the 27 games
they played during the 2005-2006 season. He remains fifth on the school's All-Time

---

[20] Attached hereto as Exhibit 22 is a *209 Times* article describing the July 21, 2019 "Gun
Down Stockton" fundraiser and celebrity basketball game attended by Mr. Stallworth
and his brother Aaron.

1    Leaderboard for his season field goal percentage, which was a remarkable 56%.

2         37.     Mr. Stallworth received many awards for his basketball successes: he made

3    the California Collegiate Athletic Association ("CCAA") All-Conference Basketball

4    Team and Conference Player of the Week on multiple occasions. And for his academics

5    and on-the-court performance, he was named the 2005-2006 CSUS Student-Athlete of

6    the Year. Later, he would be inducted into the CSUS and CCAA Basketball Halls of

7    Fame.

8         38.     Thus, the child-sized basketball that Magee accused Mr. Stallworth of

9    stealing—the basketball that was to be his son's first ball—was imbued with generational

10   importance. When Mr. Stallworth saw his son grab that ball, look up at him, and giggle

11   "ball ball ball!" he knew that there wasn't a chance in hell that he wasn't buying it for

12   S.S. Seeing that his son was drawn to a basketball, he knew that if he didn't get the ball

13   for S.S. immediately, the desire might arise again when S.S. was around an uncle or

14   cousin. Mr. Stallworth, ever the competitor, would not accept anyone but himself giving

15   S.S. his first ball. It had to be from Mr. Stallworth. He had to be the one to pass the torch.

16        39.     As if his basketball prowess weren't enough, Mr. Stallworth was also on

17   CSUS's Nike-sponsored track team and remains the most decorated track and field

18   athlete in the school's history. He won the 4x400, 400 meter, and 200 meter dash at the

19   CCAA Conference Championships and, nearly fifteen years later, he *continues to hold*

20   the school records in the outdoor and indoor 400 meter (45.40 and 47.31 seconds,

21   respectively), outdoor 200 meter dash (20.80 seconds), and indoor 4x400 (3:14:75). In

22   fact, Mr. Stallworth is currently the only person to hold two or more individual CSUS

23   school records in either track and field or cross country.

24        40.     Mr. Stallworth is also three-time All-American as a result of his ranking in

25   the top 3 Division II athletes nationwide for the aforementioned times in the indoor and

26   outdoor 400 meter dash and indoor 4x400 relay. His accomplishments led to him being

27   named the 2006 Division II West Region Outdoor Track Athlete of the Year and 2007

28   Division II West Region Indoor Track Athlete of the Year. As a result of his remarkable

THIRD AMENDED COMPLAINT
FOR DAMAGES

1  athletic achievements, Mr. Stallworth was inducted into both the CSUS and CCAA Halls

2  of Fame for both basketball and track and field.

3       41.    After college, Mr. Stallworth went on to compete at the international level as

4  a member of the Nike-sponsored Team USA, for which he won a Gold Medal as a

5  member of the 4x400 relay at the IAAF World Championship in Valencia, Spain and

6  qualified for the Olympic Trials. He was lightning fast: His personal bests include 45.40

7  seconds in the 400 meter, 20.80 seconds in the 200 meter, and 3:08.07 in the 4x400

8  indoor relay at the IAAF World Indoor Championships. While training for the World

9  Championship in Spain, Mr. Stallworth shared his gift, coaching for the Nike-sponsored

10  California Polytechnic State University, Pomona track and field team.

11       42.    Today, Mr. Stallworth is a successful designer and business owner whose

12  store "The Small Shop LA" is a Downtown Los Angeles boutique staple patronized and

13  supported by people from all over the world, including professional athletes and movie

14  stars like Kevin Durant, Odell Beckham, Jr., Gabrielle Union, and Quinn Cook.[21] During

15  his free time, Mr. Stallworth volunteers with Habitat for Humanity, the Boys and Girls

16  Club, and Gun Down Stockton.

17       43.    Mr. Stallworth's family story is one of Black excellence and remarkable

18  success, often against hefty odds. His father, Richard Stallworth, was also a native son of

19  Stockton and a star forward on the basketball teams of Saint Louis University and

20  Stockton's Edison High School. Richard Stallworth's name still hangs in the rafters at

21  both schools—at Edison alongside his close friend and former teammate, NBA legend

22  John Gianelli.

23       44.    Mr. Stallworth's grandfather, Bishop Lewis Dolphin Stallworth, Jr., was an

24

25  [21] Attached hereto as Exhibit 23 is a series of photographs showing Mr. Stallworth with
NBA champions Kevin Durant and Quinn Cook, respectively. Additionally, Exhibit 23

26  contains June, 2020 photographs from the social media accounts actresses Gabrielle
Union and Jessica Alba, and star NFL wide receiver Odell Beckham, Jr. wearing Mr.

27  Stallworth's designs (with Ms. Union's June 18, 2020 Instagram post showing her
wearing the very same sweatshirt, designed by Mr. Stallworth, that Mr. Stallworth was

28  wearing at the time of the incident).

THIRD AMENDED COMPLAINT
FOR DAMAGES                              - 15 -

Oklahoma native and the child of an Oklahoma peanut farmer. He moved his family to Stockton after serving in World War II, earning his Ph.D. in psychology, becoming the first African American to independently own an automobile dealership in Stockton. He founded a church and two schools in the city, and served as the chaplain of the Stockton Police Department. When he passed away in 2008, Lewis was eulogized on the floor of the United States House of Representatives by Representative Jerry McNerny. Mr. Stallworth, his father Richard, and his grandfather Lewis have often been featured in Stockton's newspaper, *The Record*.[22] Put simply, they are Stockton royalty.

45.    Mr. Stallworth's grandfather Lewis was born in the 1920s in Boley, Oklahoma, an all-Black town which, once a hub of Black wealth, faced a rising wave of racism in the Great Depression and the impending Dust Bowl. Shortly after Lewis' birth, Boley's nationally-renown, Booker T. Washington-endorsed, and Black-owned and operated newspaper, *The Boley Progress*, shuttered its doors. In its stead the *State Training School for Incorrigible Negro Boys* opened. Lewis was determined to leave the increasingly inhospitable town.

46.    At thirteen years old, during the height of the Great Depression, Lewis moved to Wewoka, Oklahoma where he sold chickens to pay for room and board at an all-boys' school there. Soon after moving to Wewoka, Lewis met Mary Magdalene, whom he would marry at eighteen and who would be his partner for the remainder of his life.

47.    By nineteen Lewis had been drafted into an all-Black company to serve in World War II. After his army induction in Boston, Lewis boarded a train that took him through the Deep South on his way to California. While in the Deep South, his all-Black railcar was ordered to keep their windows up for fear of attack from the very same people for whose freedom they were being shipped off to fight. When he made it to California, Lewis experienced a new manifestation of institutional racism, as his company was

---

[22] Attached hereto as Exhibits 24, 25, and 26 are just a few of the articles that have appeared in the *Stockton Record* regarding Mr. Stallworth, his father, and his grandfather, respectively.

1    ordered to build Japanese internment camps in the Central Valley. Shortly thereafter,

2    Lewis was shipped to Japan, where he served until 1946 when he was honorably

3    discharged.

4          48.    As the dust bowl was ravaging Oklahoma, Lewis brought his family to

5    Stockton, where he left an indelible impact. Through personal financial success as a Ford

6    salesman and with the added assistance of friends and tight savings, Lewis was able to

7    become the city's first Black auto dealership owner despite being shut out of business

8    loans from major banks on account of the color of his skin. Lewis' drive for success and

9    unwillingness to bow to racist obstacles led him to all his other successes: his education,

10    his church, his reputation in white and black churches across the city and country, his

11    schools, and his work with the Stockton Police Department. It was also his gift to his

12    descendants.

13          49.    On one occasion, Lewis' success and stature in the community as a pastor, a

14    wealthy businessman, and the police chaplain, was all that stood between racist police

15    officers and the life of his son and Mr. Stallworth's father Richard. In 1967, when

16    Richard was a sixteen-year-old boy, he was stopped by the police, handcuffed, and

17    accused of rape and burglary. Richard was 6'6" and the victim had identified her

18    assailant as 5'6". This inconvenient fact meant nothing to the police until, after two

19    hours, they presented Richard in a highly suggestive lineup where the victim immediately

20    exonerated him. When Lewis heard about what had happened to his son he contacted

21    Jack O'Keefe, the Chief of Police, and within moments O'Keefe arrived at their home

22    with the officers who had accused Richard, ordering the officers to shake Richard's hand

23    and apologize.

24          50.    Richard soldiered on, weathering stones and tomatoes hurled at him during

25    civil rights marches in Stockton and earning a basketball scholarship to Saint Louis

26    University ("SLU"), which he attended from 1969-1972. At SLU, Richard experienced

27    new shades of racism. Though protected when he was around coaching staff, Richard

28    rarely ventured away from campus.

THIRD AMENDED COMPLAINT
FOR DAMAGES

51.     As it turned out, Richard's protective measures during college weren't enough to keep him or his friends safe. White police pointed shotguns at him for arriving to a tow lot with cash in hand to recover his car after white campus police ordered it towed in retaliation for Richard playing on the 99%-white school's outdoor volleyball courts. And during his senior year, Richard's white roommate Buzz, the SLU student body vice president, was beaten and stoned within an inch of his life "for being a nigger lover" because of his decision to room with Richard.

52.     After graduating, Richard moved to New Orleans where he worked all of two months at a boys' home in Orleans Parish. Richard quit soon after his white supervisor gave him a stick and told him, "This is Mr. Oak; you can hit them three times and then take a break to see if they've turned red. But don't worry—you blacks don't turn red." He promptly quit and moved back to Stockton where he worked for the Employment Development Department for over 30 years. Through his experiences and those of his father, Richard imparted upon Mr. Stallworth a generational awareness of racism and how to overcome it.

53.     Mr. Stallworth's successes as a basketball player, a track star, an entrepreneur, a father, and a human have not existed beyond obstacles like those faced by his forebearers, but in spite of them. Like his father, Mr. Stallworth was harassed by Stockton Police as a child. His neighborhood was a difficult one, with prevalent gangs and drug use. As a teenager, he was often chased down the street by white police officers simply for riding his bike home. On one occasion he watched a white police officer pummeled his cousin in the back of the head after he had his hands up against a fence. "Know that you're Black" was a common refrain that Mr. Stallworth heard from his father—a warning about a world that might be less than kind to him.

54.     Mr. Stallworth heeded his father's warning, but self-awareness wasn't enough to protect him. At nineteen, he was accosted in a Dillard's department store and accused of stealing, simply because he entered the store with a box in his hand while Black.

55.     In 2010, Mr. Stallworth was detained by police officers in Santa Monica after a mentally-unstable white homeless man pointed at him and told police that Mr. Stallworth had beaten him up. One of the officers told Joel, "We are trying to get people like you off the streets." He was only freed after the officers witnessed the man continue to indiscriminately berate passersby.

56.     In 2013, Mr. Stallworth was detained and forced into the back of a police cruiser after walking his bike on a metro platform in downtown Los Angeles. He was only released after officers ran his identification for warrants and confirmed that he had paid his metro fare. This encounter resulted in an illegal and false ticket for "riding his bike on a metro platform," which he contested and won.

57.     Because of Mr. Stallworth's experiences with racism, because of the experiences of his forebearers, and most of all because of his and his forebearers' transformational success in a world too often stacked against them, he believes as much in justice as he does in reformation. The grievous harm inflicted upon him and his family described herein is not irremediable. But with each passing day that Nike remains silent and fails to own up to the trauma it has caused him and his family, the pain metastasizes, and he suffers more.

**ii.     Ms. Dickerson**

58.     Ms. Dickerson was the first of three children. Like her husband, athletics are in her DNA. The daughter of football legend Samuel Dickerson, she ran track in Modesto's Youth League, and her brother and sister were varsity high school athletes in track and field, football, and softball. Ms. Dickerson attended Lincoln High School—Stockton's largest and most academically decorated secondary school, where she was a straight-A Honors and Advanced Placement student. She also played violin and viola with the San Francisco Junior Symphony Orchestra, Chabot College Youth Symphony Orchestra, the Stockton Junior Symphony Orchestra, and the Lincoln High School Band. She learned Spanish by high school, tutoring other students in the subject. In addition, Ms. Dickerson was a volunteer with Students Against Drugs and the Treasurer of Lincoln

1   High School's Black Student Union.

2       59.    Ms. Dickerson's success was preordained. When financial difficulties

3   caused her mother to lose her business, Ms. Dickerson forwent acceptances to the

4   University of California – Davis and the University of California – San Diego to work at

5   a media manufacturing company in Stockton and take night classes at San Joaquin Delta

6   College. After a year of rising up the ranks, she moved to Los Angeles and got a job as

7   the assistant to the CFO at Rainbo Records and enrolled full time at West Los Angeles

8   College, where she was active in the Black Student Union.

9       60.    Soon after moving to Los Angeles, Ms. Dickerson transferred to the

10  University of Southern California ("USC"), where she completed her B.S. in Business

11  Administration and Master's in Accounting, all while continuing to work at Rainbo

12  Records and serving on the board of the USC Accounting Society. Her successful

13  academic career landed her a job straight out of college at Deloitte & Touche, America's

14  largest consulting firm and fourth largest privately-owned company.

15      61.    Today, Ms. Dickerson is a Partner at Ernst & Young Global Limited, the

16  world's second largest accounting and advisory corporation. At the time of the incident

17  giving rise to this lawsuit, Ms. Dickerson was a high-ranking Partner at Grant Thornton,

18  LLP, where she was in charge of the company's West Region Advisory practice,

19  overseeing strategy and brand development at Grant Thornton's offices in seven states,

20  all while consulting global Fortune 100 companies. She made partner in 2015,[23] earning

21  the distinction of becoming the first Black partner in the history of Grant Thornton's

22  West Region.

23      62.    Ms. Dickerson continues to serve as a mentor at the USC Marshall School of

24  Business and the USC Black Alumni Association. She is also a member of the Board of

25  Managers of the Stuart Ketchum Downtown YMCA. In addition, she has served on the

26  board of the Western Region of the National Association of Black Accountants and on

27

28  [23] Attached hereto as Exhibit 27 is an *Inside Public Accounting* article describing Ms.
    Dickerson's rise to partner at Grant Thornton.

THIRD AMENDED COMPLAINT
FOR DAMAGES                          - 20 -

the cabinet of the United Way of Greater Los Angeles' Tocqueville Society, where she works to steer philanthropic investment into communities with acute needs.

63.    Ms. Dickerson too carries a generational torch of Black excellence. Her late father, Samuel Dickerson, was a Los Angeles legend and a national treasure. A child of Stockton and an all-state athlete in basketball, football, baseball and track, he solidified his legend at USC. His late fourth-quarter 32-yard reception against UCLA in 1969 sent USC to a then-record fourth consecutive Rose Bowl appearance and is considered by most to be the most exceptional USC reception of all time.

64.    Notwithstanding his historic winning catch, Samuel considered his crowning achievement to be USC's winning matchup against Alabama in 1970. It was called "the Game That Changed the Nation," because never before had an integrated team played in the Deep South, and play they did, dismantling the Crimson Tide with such technical precision that they opened the floodgates of integration in college football. Indeed, the very next day, famed Alabama coach Bear Bryant walked into a Crimson Tide Board of Trustees meeting and demanded that they allow him to recruit Black players. Just like that, Southern schools could no longer deny scholarships to promising Black student-athletes. The Showtime Documentary *Against the Tide* tells the story of Samuel Dickerson and that monumental game. He was similarly profiled in the book *One Night, Two Teams: Alabama vs. USC and the Game that Changed a Nation*.

65.    Samuel Dickerson's incredible athletic ability, academic accomplishments, and work ethic inspired legions of young athletes of all races. His games were among the first sports games to be nationally-televised, and his outstanding USC team inspired today's football luminaries, like Seattle Seahawks coach Pete Carroll, who called Samuel on his death bed to tell him how much he meant to him.

66.    To Ms. Dickerson, Samuel was dad. He was a loving and intensely involved father—attending all her violin recitals and school plays, and took her to hundreds of sporting events, including dozens of Oakland Raiders, Sacramento Kings, and USC Trojans games. At USC, he was given lifetime passes to seats set just above "Sam's

1    Corner," the corner of the endzone where he made his historic catch.

2        67.    Samuel also recounted harrowing tales of his time in Alabama cloistered in

3    shack shops and fleabag motels—all assigned by the Green Book and the only ones that

4    would have him and his teammates during America's apartheid. He and his teammates

5    were heckled with shouts of "nigger" and other epithets by people in virtually every town

6    where his bus stopped in Alabama.

7        68.    Before passing the torch to Ms. Dickerson, Samuel received it from his

8    parents. Ms. Dickerson's grandmother was a star basketball player in Jim-Crow era

9    northeast Texas. She was selected by her community to attend college in Tyler, Texas

10   when they pooled their resources to send a select few off to receive higher education. It

11   was as much a testament to her intelligence as it was to Black resilience during that

12   painful time.

13       69.    Ms. Dickerson's grandfather was one of exceedingly few wealthy Black

14   farmers in Texas, having inherited a large cotton farm from his family, who were among

15   the mere 5,000 Black families (against 1.5 million white families) who received property

16   under the Southern Homestead Act of 1866. Ms. Dickerson's grandfather hosted Negro

17   League Baseball exhibitions on his property in Northeast Texas. Today, Ms. Dickerson

18   owns 29 acres of her grandfather's historic property, where another 79 acres are owned

19   by other family members.

20       70.    Ms. Dickerson's mother, Leslie Clark, was an adoptee to a well-to-do Black

21   Portland, Oregon couple. She had a privileged childhood and was a prolific activist from

22   a young age. At just fourteen years old she successfully petitioned to end her high

23   school's sexist ban on girls wearing pants. At just eighteen years old, just after both of

24   her adopted parents passed away, she enrolled at the University of Portland and served as

25   the NAACP's representative on the board of the Multnomah County Police Commission

26   after a rash of unjustified police shootings killed a number of Black teenagers.

27       71.    Leslie became a nurse and worked for years at the San Joaquin County Jail

28   before engaging her passion for service to open, own, and operate a group home for

THIRD AMENDED COMPLAINT
FOR DAMAGES                          - 22 -

children who had lost their way. Throughout Ms. Dickerson's childhood, she attended NAACP meetings with her mother, who was the Stockton Chapter Secretary.

72.    Because of her committed parents and her committed stepfather Michael—a San Joaquin County Sheriff and two-time Iraq War veteran (serving in Fallujah and Mosul)—no obstacle would keep Ms. Dickerson from success. But even as she powered through her childhood with all of the poise and curiosity of a young woman who picked up competitive violin by the age of eight and learned to speak Spanish by high school, she did not live life unaware of the myriad ways in which hateful people saw her skin.

73.    As a teenager, Ms. Dickerson and a number of Black friends were ordered to leave their own gated community after police lied that they had "received information that there was gang and drug activity," when in fact they had simply received a call about "[Black] kids who look out of place."

74.    A few years later, Ms. Dickerson's then-boyfriend was pulled over and handcuffed for "fitting the description of a robbery in the area," even though he was driving a one-of-a-kind collector car that did not fit the description at all.

75.    As an accountant, Ms. Dickerson had a "walking while Black" experience in which she was detained by a police officer and questioned aggressively when leaving her office late at night on alleged suspicion that she had "broken into the building." The officer terrified her, barking orders at her with his hand on his firearm and demanding to know whether she was on parole or had warrants for her arrest.

76.    While living in Seattle, Ms. Dickerson was assaulted by an event bouncer who refused to believe that she had a reservation. She had arrived at the restaurant as an escort for a white friend who had cerebral palsy and was already inside the establishment. The bouncer threatened to call the police on Ms. Dickerson and refused to believe that she owned a condominium in the same building.

77.    While on vacation in Montana and Idaho, Ms. Dickerson was pulled over and interrogated by police for an alleged "window tint" violation on her un-tinted vehicle. It wasn't until the police officer saw and questioned her white passenger that he

THIRD AMENDED COMPLAINT
FOR DAMAGES

1   let them go.

2          78.     Because of these experiences, Ms. Dickerson understands justice as much as

3   she loathes injustice. The pain Nike brought her, as described herein, has not abated. She,

4   like her husband and son, seeks redress for the suffering she continues to experience.

5   This has not gotten easier for her—if anything, it has gotten harder, as the very people

6   who traumatized her family continue to treat her as though her life and that of her

7   husband and infant son don't matter at all.

8          79.     Before Nike brought this trauma upon the Stallworth-Dickerson family, and

9   before Nike utterly failed to show any meaningful contrition and take steps to right its

10  wrongs, Mr. Stallworth and Ms. Dickerson counted themselves among some of Nike's

11  strongest supporters. Nike's "support" for Mr. Stallworth as a college athlete, as a

12  professional athlete, and as a coach meant the world to him. Ms. Dickerson has worked

13  with Nike in her capacity as a board member of the Western Region of the National

14  Association of Black Accountants and she felt a special connection to the company as a

15  result of the image Nike appeared to cultivate on racial justice issues. For Nike's outward

16  image, Ms. Dickerson was even willing to overlook the time a Nike employee

17  approached her at an executive meeting at Nike's headquarters and attempted to recruit

18  her for a position well below her training and experience. But now that Nike enlisted

19  armed police to intimidate and endanger her and her family, she can no longer look the

20  other way.

21         80.     The trauma that Nike has brought upon this family and Nike's total lack of

22  remorse for the same make clear that Nike's image is nothing more than a marketing ploy

23  to access the wealth of the Black community. This became painfully clear on July 5,

24  2019.

25  **B.      Nike's Racial Profiling and Traumatic Endangerment of the Lives of the**

26  **Stallworth-Dickerson Family**

27         81.     On July 5, 2019, Mr. Stallworth, Ms. Dickerson, and S.S. were hosting their

28  friend Rebecca and her son Khalil, who were visiting them from the Bay Area. They

decided to take their friends to the Santa Monica Promenade to go shopping and eat
dinner together in celebration of Rebecca's birthday. Mr. Stallworth, Khalil, and S.S.
went into the Nike Store on the Promenade while Ms. Dickerson and Rebecca finished
shopping at a nearby store. Choosing Nike was not happenstance. Unaware of the slew of
gender and racial discrimination cases lodged against Nike and armed only with Nike's
clever advertisement campaign messaging, Nike represented to them a new era of
corporate responsibility and awareness—one that intimately represented their own
success.

82.    Once inside the Nike store and toddling in front of his father, S.S. bee-lined
to an area where children were playing with loose Nike balls. Ms. Dickerson and
Rebecca entered the store shortly thereafter.

83.    S.S. joined the other kids, pointed at a child-sized basketball and looked up
at his father with a massive grin on his face. This was a big moment. S.S.'s first
basketball represented the continuation of a multi-generational legacy, from Mr.
Stallworth's grandfather and father and Ms. Dickerson's grandmother and father all the
way down to S.S. S.S. giggled, "ball ball ball!" Naturally, Mr. Stallworth made sure to
record it on his phone. S.S. picked up the ball and began to toddle around the other
children, all the while looking up at his father with a smile on his face. Mr. Stallworth
continued to record the moment and announced to his friends in real time on Instagram,

84.    "S.S.'s first basketball!" He handed his credit card to a cashier to purchase
the ball.[24] He held onto the receipt, which was rare for him. A few minutes later, the
Stallworth-Dickerson family and their friends left the store.

85.    Mr. Stallworth and S.S. were happy. Mr. Stallworth mimicked basketball
moves with his son and they walked out of the store and onto the promenade. This happy
moment lasted only a few seconds.

86.    Magee saw a Black man in a hoodie leave her store with a basketball and

---

[24] Mr. Stallworth paid full price for the child-sized basketball, not the 30% discount rate
Nike Retail gives to police officers on "Law Enforcement Appreciation Day." *See*
Exhibit 28 (Nike – Law Enforcement Appreciation Day Advertisement).

she sprang into action. She had no reasonable suspicion, let alone probable cause, but that didn't stop her. She bolted out the door and ran after them across the promenade. Magee shouted at Mr. Stallworth, "Hey, you stole that ball! You need to return that stolen ball!" She jumped right in front of Mr. Stallworth and S.S. to impede their path. She lunged at Mr. Stallworth and attempted to snatch the ball from his hands, even touching the ball, but he hugged it close. Intentionally depriving them of their freedom of movement, she stood her ground and repeated her accusation several times. She continued to impede Mr. Stallworth's and S.S.'s path and lunge at Mr. Stallworth. Mr. Stallworth responded, over and over, "What are you talking about? I bought this. Leave us alone." Mr. Stallworth was terrified but tried to maintain his composure as an example for his son.

87.    Hearing the commotion, Ms. Dickerson turned around and repeated that they had purchased the ball. She was shocked to see Magee verbally attacking Mr. Stallworth, blocking his and S.S.'s path, and attempting to take the ball from his hands. Ms. Dickerson, fearing for her own safety, the safety of her child, and the safety of her husband, started back toward Magee, S.S., and Mr. Stallworth.

88.    Magee looked at Ms. Dickerson, surely sensing Ms. Dickerson's determination to protect her family, and she ran off. Ms. Dickerson picked up S.S. and put him over her chest in a sling.

89.    Magee ran over to three armed SMPD officers, pointed down the block at Mr. Stallworth, and lied to them, telling them that Mr. Stallworth had stolen a child-size basketball. The three armed SMPD officers, who were wearing bulletproof vests, followed Plaintiffs, surrounded and detained them, and parroted Magee's accusations. One of the officers, Jacob Emanuel, had killed an unarmed man the year before. *See* footnote 1, *supra*. "Give her the stolen ball," Emanuel barked as the officers repeatedly placed their hands on their firearms. The officers, alongside Magee, surrounded the family and intentionally deprived them of their freedom of movement.

90.    Magee lied to the officers again, now telling them that she had asked every employee working that evening and they all told her that the Stallworth-Dickerson family

THIRD AMENDED COMPLAINT
FOR DAMAGES                                    - 26 -

had stolen the ball. The family was terrified. They were surrounded by guns, bulletproof
vests, and barking officers, all at the behest of a lying, racist Nike Retail employee.

91.    The officers had taken no steps to confirm Magee's story before surrounding
the Stallworth-Dickerson family and their friends. They saw a white woman and upon
seeing that she had accused a Black man in a hoodie, family in tow notwithstanding, they
took her word as fact. Indeed, in the police report written by SMPD Officer Emanuel, he
wrote only that "an un-named Nike Employee [ ] told [Emanuel] a subject had stolen a
basketball from the Nike Store" and "pointed to a group walking northbound and stated
the subject in a pink sweatshirt (later identified as Stallworth, Joel) had taken the ball and
still had it."[25]

92.    The promenade was busy, and a crowd started to form. Some took out their
phones to record videos and snap photographs. Now, compounding this family's fear was
a deep sense of shame, the residue of which remains to this day. They were being treated
like dangerous criminals, put up for show in the middle of a busy promenade. Their
reputations and lifetimes of success shriveled into oblivion behind the color of their skin.

93.    Mr. Stallworth repeated to the armed officers that he had purchased the ball.
Ms. Dickerson told them too, saying "We just told you we bought it. What do you need
the receipt for?"

94.    Magee repeated the lie: "Because we didn't have our basketball," she said.
Mr. Stallworth was upset and continued to plead his case. His pleas fell on deaf ears.
Another officer barked at him, "Calm down! You're with your son!" Mr. Stallworth
could not calm down precisely because he was with his son. Magee tried to snatch the
receipt from Mr. Stallworth's hand.

95.    Mr. Stallworth, terrified for himself and his family, not to mention deeply
ashamed of the spectacle, had had enough. He rolled the ball across the promenade and
tossed the receipt on the ground. One of the officers walked toward the ball with Magee,

---

[25] Attached hereto as Exhibit 29 is the police report drafted by SMPD officer Jacob
Emanuel.

picked it up, smiled at her, and placed it in her hands. Another officer picked up the

receipt, snapped at Mr. Stallworth to "chill out," and showed the receipt to Magee. They

were still surrounded.

96.    Mr. Stallworth continued to beg his case. He was at least five feet away from

Magee while he pleaded with the officers and Magee. Nevertheless, one of the officers

stepped in front of Mr. Stallworth and Ms. Dickerson, who still had then-19-month-old

S.S. over her chest in a sling. The officer put his hand in Ms. Dickerson and S.S.'s faces

and snarled at Mr. Stallworth, "You're intimidating her!" Mr. Stallworth responded,

"She's intimidating me." Ms. Dickerson chimed in, telling the officers and Magee that

her family had been racially profiled, and stating "She's intimidating *us*. She is harassing

us, following us, running after us. We bought this!"

97.    Mr. Stallworth and Ms. Dickerson were rightly horrified. Nike and Magee

had put them on exhibition for the crowded theater of the promenade and they feared for

their safety and the safety of their child. Keeping a watchful eye on the officers' hands,

which tapped on and off of their guns, the family announced that they intended to return

the ball for a refund immediately.

98.    Ms. Dickerson, with S.S. still in the sling, walked cautiously with Mr.

Stallworth, Rebecca, and Khalil into the store. They were followed at close clip by the

armed officers, who continued to surround them. Even in their efforts to return the ball

and rid themselves of any memento of this terrifying experience, they were being treated

like dangerous criminals. They were overcome with fear and humiliation.

99.    Mr. Stallworth and Ms. Dickerson processed the return, continuing to look

over their shoulders at the armed officers as they held their perimeter, unrelenting in their

posture as if this family was conniving delinquents rather than an innocent, successful

and proud Black family trying desperately to end this nightmare and maintain their

dignity.

100.    Ms. Dickerson mustered up the strength to ask to speak with the manager. A

young Black male employee pointed to Magee, the very woman who had brought this

trauma upon them. The same employee had earlier told Ms. Dickerson and Rebecca in a hushed tone, "She does this all the time. She has done it multiple times today. As a Black man, I know what it feels like."

101.    After returning the ball and getting their refund, the family left. The family and Rebecca and Khalil went to dinner, desperately trying to forget what they'd just gone through. After all, the weekend was just beginning. Moreover, it was Rebecca's birthday and they wanted more than anything to make it a good one for her.

102.    But they couldn't get it out of their mind. They replayed, over and over, the parade of horrific images of innocent African Americans brutalized by police and private security that have come to saturate America's airwaves and bring this country to a breaking point. Mr. Stallworth couldn't even eat. He was so distraught that he began to cry and left the restaurant to go sit in the car, alone with his thoughts. Ms. Dickerson stayed inside with Rebecca and Khalil to feed S.S., and when dinner was done, they headed home.

103.    Once home, Mr. Stallworth and Ms. Dickerson discussed how many people had witnessed the incident, and how fearful they were that their reputations—the lifeblood of their careers—could be ruined if someone else posted videos or took control of the narrative and painted them as bad actors. Mr. Stallworth told Ms. Dickerson, "We have to control this narrative. Those people out there thought that we were stealing."

104.    During the days that followed, Ms. Dickerson reached out to senior partners in order to fulfill her duties (to Grant Thornton, the California Board of Accountancy, bank clients, and the federal government as a result of her secret clearance) to disclose potential allegations of ethical violations and conflicts of interest. Ms. Dickerson worried relentlessly that Nike Retail's accusations could affect her compliance with Grant Thornton's and the California Board of Accountancy's ethical conduct standards. Additionally, as Ms. Dickerson oversaw consulting services at Grant Thornton's Oregon office, she worried that the incident would create a conflict and disrupt their potential revenue stream with Nike, which Grant Thornton listed as a strategic account for its

1   Portland office, and for which Ms. Dickerson had written a strategic plan.

2       105.   Ms. Dickerson and Mr. Stallworth were overwhelmed. Mr. Stallworth closed

3   his shop for the next few days and Ms. Dickerson reached out to her office manager to

4   cancel most of her meetings for the next month and access information about Grant

5   Thornton's family assistance program and mental health hotline, which they would use to

6   pay for Mr. Stallworth's therapy.

7       106.   There was no escaping the devastation this family felt. Rebecca and Khalil

8   were slated to stay through the weekend, and they did, but Mr. Stallworth and Ms.

9   Dickerson still feel deep remorse that they were unable to play host because they were

10  consumed by fear, sadness and anger. Mr. Stallworth and Ms. Dickerson spent the

11  weekend crying, unable to sleep, and going over all the "what ifs" in their heads. They

12  reached out to family, and they reached out to friends who could help them spread the

13  word and save their reputations.

14      107.   The family attended an extended-family barbecue in Granada Hills the day

15  after the incident, where they struggled to face the barrage of questions they received

16  about what Nike had done to them. That night they cried more, and Mr. Stallworth went

17  another evening without sleep. In all, Mr. Stallworth did not sleep for four straight nights.

18  He was consumed with pain and fear for the world his son would inherit. Ms. Dickerson

19  struggled to sleep, too. Neither Mr. Stallworth nor Ms. Dickerson would get a full night's

20  sleep for weeks. Rebecca and Kahlil could hear Mr. Stallworth and Ms. Dickerson

21  yelling at each other through the walls. They seemed broken.

22      108.   S.S. also had difficulty sleeping. Ms. Dickerson and Mr. Stallworth noticed

23  it at home, and S.S.'s daycare teachers noticed it too, reaching out to Mr. Stallworth and

24  Ms. Dickerson to express their concern.

25      109.   On the day after the incident, Ms. Dickerson called the Santa Monica Police

26  Department seeking an incident report and to make a citizen complaint. She asked to

27  speak with Officer Emanuel, and when she finally got through to him that evening, he

28  told her, "there will be no report because there was no incident." Ms. Dickerson was

shocked. Officer Emanuel attempted to evade responsibility, claiming that it was "up to

the officer to determine whether there should be a report, and since this incident was

resolved on site there was no report necessary." Ms. Dickerson did not relent and was

eventually told that she could only submit a request for an incident report in person.

Despite the additional trauma of having to return and face Emanuel in person, she

determined to go to the station the next day.

110.    On Sunday, July 7, 2019, Mr. Stallworth and Ms. Dickerson went to Santa

Monica and met with Emanuel, who finally relented and drafted a report.[26] Despite a

brevity, tenor and tone that wholly fail to reflect the gravity of what occurred, and despite

Emanuel's intentional omission of the names of the other two officers present despite

their appearance on camera detaining the family, Emanuel's report nevertheless makes

clear that the SMPD officers lacked probable cause to do so.[27] Indeed, per Emanuel's

report, the entirety of the information learned by the SMPD officers prior to detaining the

family was that "an un-named Nike Employee [ ] told [Emanuel] a subject had stolen a

basketball from the Nike Store" and "pointed to a group walking northbound and stated

the subject in a pink sweatshirt (later identified as Stallworth, Joel) had taken the ball and

still had it."

111.    Mr. Stallworth and Ms. Dickerson felt and continue to feel a deep sense of

[26] *See* Exhibit 29 (police report).

[27] "Reasonable suspicion exists when the person responsible … is aware of specific
articulable facts, and inferences from those facts, which reasonably warrant a suspicion
that evidence will be uncovered." *Kirkpatrick v. Los Angeles*, 803 F.2d 485 (9th Cir.
1986). This police report establishes that the SMPD officers acted in the absence of
reasonable suspicion to detain the Stallworth-Dickerson family at Nike Retail's behest.
*Fla. v. J.L.*, 529 U.S. 266, 272 (2000) ("An accurate description of a subject's readily
observable location and appearance is of course reliable in this limited sense: It will help
the police correctly identify the person whom the tipster means to accuse. Such a tip,
however, does not show that the tipster has knowledge of concealed criminal activity.
The reasonable suspicion here at issue requires that a tip be reliable in its assertion of
illegality, not just in its tendency to identify a determinate person."); *United States v.
Williams*, 114 F. Supp. 2d 629, 633 (E.D. Mich. 2000) (holding that "an informant's
bald accusation that Defendant trafficked in illegal drugs and carried a weapon, [even
when] coupled with Defendant's apparent nervousness when the police stopped his
vehicle do[es] not equate to a 'particularized and objective basis for suspecting'
Defendant of criminal acts; i.e., reasonable suspicion did not exist.").

THIRD AMENDED COMPLAINT
FOR DAMAGES                                    - 31 -

betrayal. Nike, a place they had seen as a progressive corporate refuge from the fear and danger that too often arises from living while Black in America, turned out to be another bad actor. Nike had paid tens to hundreds of millions of dollars to Wieden+Kennedy to cultivate an image of care and concern for Black America all while perpetuating indifference and violence against it.

112.    The family tried desperately to get Nike to atone for what it had done. Ms. Dickerson reached out to Nike but received no response until she spoke with a close friend with connections to Nike's corporate office. That response was, in the end, not a response at all. It was a single email and call from Blanca Gonzalez, Nike Retail's Los Angeles Operations Manager. Gonzalez spoke with Ms. Dickerson briefly, telling her that she was on vacation and that she would call back after she returned to the country. Gonzalez never called back.

113.    Through lessons passed down to them and traumatic experiences of their own, Mr. Stallworth and Ms. Dickerson are hyper-aware and extremely sensitive to the fact that America has never truly addressed its original sin. They know that no matter how peaceful they are, no matter how successful they are, there are places where their safety and dignity might be made subordinate to the prejudices of others. If anything from these last few weeks is clear, America is finally awakening to this reality. But the Stallworth-Dickerson family hoped and believed there were a growing number of spaces where they could let their guard down. One of those spaces was supposed to be Nike.

114.    For Mr. Stallworth and Ms. Dickerson, the depth of this harm cannot be overstated. Their lives had been deeply enmeshed with Nike. To them, Nike represented "one of the good guys." Living their lives as Black in America has its dangerous obstacles, but they were sure that Nike was on their side. Now they wonder, "If Nike is dangerous and remorseless, what refuge do we have left?" Ms. Dickerson describes the feeling of betrayal as akin to witnessing a close family member that she looks up to turn out to be a serial abuser. And despite going to Santa Monica about twice a month before the incident to train on the beach and stairs, Mr. Stallworth has refused to return in the

1  year that has passed since the incident.

2  115.   Even more traumatizing, Nike now has the distinction of providing S.S. with

3  his first exposure to a world where killer armed police might be sicced on him because of

4  the color of his skin. Nike also humiliated Mr. Stallworth in front of his son. A

5  generational, once-in-a-lifetime moment—the one where S.S. picked his first basketball

6  like his father and grandfather before him—was taken away and replaced with a lesson

7  that no child should have to learn. Mr. Stallworth took his son into what he thought was a

8  safe place to introduce him to a deep family tradition. Instead of experiencing the elation

9  that a decorated basketball player and son of a decorated basketball player would feel

10  when his own son picked up a basketball for the first time, he was endangered and

11  embarrassed in front of his child.

12  116.   The family now constantly finds itself on edge, deeply sad, frustrated

13  without provocation, and more fearful than ever in retail establishments. Mr. Stallworth

14  never forgets to keep a receipt, goaded on by the fearful "what if" that has burrowed deep

15  within him.

16  117.   Mr. Stallworth sought therapy after the incident and recalls a particularly

17  difficult therapy session about a month after the incident, a few days after which he broke

18  down crying while pushing S.S. in a stroller. He didn't want S.S. to ever have to go

19  through this. He and Ms. Dickerson had built a life that he had always imagined would

20  insulate S.S. from being reduced to a criminal for the color of his skin. They are

21  financially successful and can afford most things that S.S. might want, but no amount of

22  money and no amount of reliance on spaces like Nike, which profit off a thin veneer of

23  "wokeness," can shield their son from the dangers of being Black. Nike and Magee put

24  that in stark relief for Mr. Stallworth, violently stripping away, forever, his confidence in

25  his own ability to protect his child.

26  118.   Mr. Stallworth has continued to struggle since the incident. Even after he

27  opened back up his store, he was unable to regain his composure. In August of 2019,

28  when HBO began filming in front of his shop and thus blocking patrons from entry, he

THIRD AMENDED COMPLAINT
FOR DAMAGES                         - 33 -

went outside, yelled at them, and kicked their street cones. Mr. Stallworth has prided himself on his strong reputation among the Downtown Los Angeles athletic and artistic community as a creative, peaceful, highly sociable, and persistently happy presence. This reputation has earned his shop visits from some of the biggest names in the NBA. He felt immense shame for his loss of composure and realized how necessary therapy was for him to work through the effects of Nike's actions.

119.    Ms. Dickerson has struggled to regain her edge. Like Nike's executive leadership,[28] Grant Thornton is disproportionately white. Fewer than ten percent of partners at Grant Thornton are people of color. She worked hard to become the first Black partner in Grant Thornton's West Region and to make new space for Black women in her field, yet she found herself having to reach out to the company's top brass to tell them that her reputation was in jeopardy, and that she would likely be unable to further her role in planning and supervising strategy for a top strategic account.

120.    Ms. Dickerson was humiliated, and she had to cancel her meetings and cut her workload by 90% for the next month just to regain some semblance of composure. Even still, she has been unable to recover. Ms. Dickerson was in contention for a coveted position on Grant Thornton's Board of Directors. Obtaining the position required an all-out campaign to garner the support of the majority of the company's 600 partners. After the incident, she could not follow through with the rigors that the campaign required. She slowly withdrew from campaigning and failed to obtain the board position that she so desperately wanted.

121.    Being a vocal leader had come naturally to Ms. Dickerson, but now she experiences fatigue and anxiety and has to put forth twice as much effort to lead, drawing concern from her friends and coworkers. She started receiving complaints from senior partners—that she had "lost her optimism," that she had become "extremely negative," that she had become "a complainer." After an August partner meeting in Las Vegas,

---

[28] *See* Exhibit 1 (Screenshot of Nike's Executive Board as displayed on Nike's website on June 9, 2020).

where she oversees strategic development at another one of Grant Thornton's offices, she was told that her negativity was palpable, and she was "not like herself." The next month, a senior partner approached her and offered to provide her with an executive coach to help her work through the problems brought upon her by Nike.

122.    Ms. Dickerson received and continues to receive emails, texts, calls and comments from coworkers, friends, and acquaintances halfway around the world asking her about the incident. And in late October, 2019, Ms. Dickerson attended a diversity summit at Caesar's Palace, which is one of her clients. During the convention, while she was entertaining a high profile client, Ms. Dickerson was approached by NAACP board members and local businessmen who immediately asked her about the incident.

123.    Mr. Stallworth receives the same kinds of questions and communications, from current Nike-sponsored athletes to customers, friends, and business partners. For him, just as for Ms. Dickerson, there is no reprieve.

124.    Mr. Stallworth and Ms. Dickerson did their best to mitigate the harm from this incident both in the moment by recording and posting it to social media for their safety, and afterward by speaking with media outlets. Their careers are built around their reputations, and since many unknown people were present on the promenade and filmed the incident, it was critical for them to preempt the spread of false narratives. Nike's actions had imperiled their reputations as much as their physical safety, and forced them to take these protective measures, which themselves have had unavoidable side effects. Millions of people have viewed the incident and its aftermath, and not a day goes by during which this family is not retraumatized by its mention.

125.    Nike Retail employees had previously complained about Magee's racial bias towards and racial profiling of Black patrons and employees. For example, on July 15, 2016, an employee of Nike's Store in Beverly Hills complained to Nike, Inc. about Magee's "perception of who can be classified a shoplifter," particularly "[h]er negative assumptions about every athletic looking African-American guy." Attached hereto as Exhibit 30 is a true and correct copy of an email from Cameron Bailey, a former Nike

employee, to Antoine Andrews, Nike, Inc.'s then-Vice President of Diversity & Inclusion regarding Magee's discriminatory attitude and behavior. Mr. Bailey makes clear that he had complained to supervisors at Nike Retail and felt like he was "being singled out for speaking out on profiling issues that shouldn't be happening." Neither Nike Retail nor Nike, Inc. did anything in response to this complaint.

126.   Plaintiffs bring this action for damages against Defendants for general, compensatory, and statutory damages, costs and attorneys' fees, declaratory and injunctive relief for Defendants' unlawful and egregious conduct, as alleged herein. Additionally, Plaintiffs seek punitive damages against the individual Defendants.

127.   This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1981, and for violations of California State law.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 – Unlawful Detention and False Arrest and Imprisonment
### (All Plaintiffs Against All Defendants)

128.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set herein.

129.   On or about July 5, 2019, Defendant Magee, acting in concert with the Santa Monica Police Department and under color of state law, deprived Plaintiffs of the rights, privileges, and immunities secured by the Constitution and the laws of the United States, including those secured by the Fourth Amendment to the Constitution, incorporated and made applicable to the states by the Fourteenth Amendment by subjecting them to unlawful detention.

130.   The foregoing wrongful acts and failures to act of Defendants resulted in the detention of Plaintiffs. As a proximate result of the foregoing wrongful acts of Defendants, Plaintiffs have suffered and will continue to suffer both physical and emotional injuries, including, but not limited to, stress, humiliation, and anxiety, as

described in detail in paragraphs 13-125, *supra*.

131.    By engaging in the foregoing wrongful acts and failures to act, Defendants acted with conscious disregard of Plaintiffs' rights. Defendant Magee had no reason to seek out the SMPD officers to detain Plaintiffs. When the SMPD officers detained Plaintiffs, they lacked sufficient information to establish reasonable suspicion, let alone probable cause. The SMPD officers' detention of Plaintiffs was made pursuant to an agreement with shopkeepers in and around the Third Street Promenade, including Defendants Nike Retail and Magee, whereby SMPD detains all individuals shopkeepers accuse of theft or against whom shopkeepers make citizens arrests or detentions. This agreement substitutes the judgment of private parties for the SMPD's own authority as SMPD simply carries out the shopkeepers' directions. Moreover, even after the SMPD officers confirmed that Mr. Stallworth had purchased the basketball, they nevertheless continued to restrict Plaintiffs' freedom until their refund was finalized.

132.    In addition, Nike's policies, procedures, training regarding antibias and enforcement of same were not adequate to train its agents and employees to avoid unlawful arrests and detentions including, but not limited to, investigatory techniques, racial bias training, theft control training, and witness interviewing. Nike was thus deliberately indifferent to the obvious consequences of the failure to promulgate antibias policies, procedures, practices training and to enforce same with its agents and employees adequately, thus culminating in Defendants' unlawful conduct toward Plaintiffs.

133.    Employees complained to Nike about Defendant Magee's racial profiling of and racial bias towards Black patrons and employees. Nike's failure to respond to those complaints led to Plaintiffs' unlawful detention and false arrest and imprisonment.

134.    Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

/ / /

/ / /

THIRD AMENDED COMPLAINT
FOR DAMAGES

- 37 -

# SECOND CAUSE OF ACTION

## 42 U.S.C. § 1981 – Equal Rights Under the Law

### (Plaintiff Joel Stallworth Against All Defendants)

135.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set herein.

136.   California's Unruh Act provides that "No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51." Cal. Civ. Code § 51.5. Subdivision (b) includes race. *Id.* at § 51. The Fourth Amendment to the United States Constitution and Section 13 of Article I to the California Constitution protect against unlawful searches and seizures. The Fourteenth Amendment to the United States Constitution and Section 7 of Article I to the California Constitution protect the individual's right to life, liberty, and property. And Section 31 of the California Constitution protects the individual's right to be free from discrimination by the state.

137.   On or about July 5, 2019, Defendants denied Mr. Stallworth the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white people, as secured by 42 U.S.C. § 1981 by, among other things, on account of his race, singling him out for unlawful oppression by preventing him from maintaining ownership of his lawfully purchased basketball without providing Defendants with a paper receipt showing the same. These actions violated California's Unruh Act. Cal. Civ. Code § 51.5, the Fourth and Fourteenth Amendments to the United States Constitution, and Sections 7, 13, and 31 to Article I of the California Constitution. This was purposeful and systematic, as Magee had history, known to Nike at all times relevant herein, of doing the same to other Black customers and employees. This was also done in conspiracy with SMPD officers acting with the coercive power of the state. Plaintiffs are informed and believe and thereon allege that Defendant Magee sold basketballs to similarly-situated individuals who were not African Americans without the

added condition that they be subjected to detention or provide her with proof of purchase, and that race motivated her decision to require the same of Mr. Stallworth.

138.   Employees complained to Nike about Defendant Magee's imposition of race-based conditions on purchases. Nike's failure to address or respond to those complaints led to the events described in this Third Amended Complaint.

139.   As a proximate result of the foregoing wrongful acts of Defendant Magee, Mr. Stallworth suffered and will continue to suffer both physical and emotional injuries, including, but not limited to, stress, humiliation, and anxiety, as described in detail in paragraphs 13-125, *supra*.

140.   In addition, Nike's policies, procedures, practices and training were not adequate or sufficiently enforced to train and prevent its agents and employees from adding race-based conditions on purchases, including, but not limited to racial bias and theft-control issues in said policies, procedures, practices and training.

141.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1985 Deprivation of Rights and Privileges

### (All Plaintiffs Against All Defendants)

142.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set herein.

143.   On or about July 5, 2019, Defendants Magee, Nike Retail, Nike, Inc., and Does 2-10, along with the Santa Monica Police Department, on Santa Monica, California's Third Street Promenade, conspired to deprive Plaintiffs of the equal protection of the laws and equal privileges and immunities of the laws, and for the purpose of hindering the constituted authorities of the State of California from securing to them the equal protection of the law.

144.   The foregoing wrongful acts and failures to act of Defendants were

THIRD AMENDED COMPLAINT
FOR DAMAGES

motivated by Plaintiffs' race and resulted in the detention of Plaintiffs. As a proximate
result of the foregoing wrongful acts of Defendants, Plaintiffs have suffered and will
continue to suffer both physical and emotional injuries, including, but not limited to,
stress, humiliation, and anxiety, as described in detail in paragraphs 13-125, *supra*.

145.  By engaging in the foregoing wrongful acts and failures to act, Defendants
acted with conscious disregard of Plaintiffs' rights. Defendant Magee had no reason to
seek out the SMPD officers to detain Plaintiffs. When the SMPD officers detained
Plaintiffs, they lacked sufficient information to establish reasonable suspicion, let alone
probable cause. The SMPD officers' detention of Plaintiffs was made pursuant to an
agreement with shopkeepers in and around the Third Street Promenade, including
Defendants Nike Retail and Magee, whereby SMPD detains all individuals shopkeepers
accuse of theft or against whom shopkeepers make citizens arrests or detentions. This
agreement substitutes the judgment of private parties for the SMPD's own authority as
SMPD simply carries out the shopkeepers' directions.  Moreover, even after the SMPD
officers confirmed that Mr. Stallworth had purchased the basketball, they nevertheless
continued to restrict Plaintiffs' freedom until their refund was finalized.

146.  In addition, Nike's policies, procedures, practices and training and
enforcement thereof were not adequate to train its agents and employees to avoid
unlawful arrests and detentions including, but not limited to, investigatory techniques,
racial bias training, theft control training, and witness interviewing. Nike was thus
deliberately indifferent to the obvious consequences of the failure to promulgate, enforce
and train its agents and employees adequately on any antibias policies, procedures and
practices. This lack of training led to the unlawful detention and false arrest and
imprisonment of Plaintiffs.

147.  Employees complained to Nike about Defendant Magee's racial bias
towards and racial profiling of Black patrons and employees. Nike's failure to respond to
those complaints led to Plaintiffs' unlawful detention and false arrest and imprisonment.

148.  Defendants' conduct was willful, wanton, malicious, and oppressive, thereby

justifying an award of punitive damages against Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### FOURTH CAUSE OF ACTION

### Cal. Civ. Code § 51.5 – Unruh Act

### (All Plaintiffs Against All Defendants)

149.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

150.   The Unruh Civil Rights Act, codified at California Civil Code section 51 subdivision (b) provides, "All persons within the jurisdiction of this state are free and equal and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Enacted in 1959, the Unruh Civil Rights Act amended an 1897 version of Civil Code section 51 that was declarative of a common law doctrine requiring places of public accommodation "to serve all customers on reasonable terms without discrimination and … to provide the kind of product or service reasonably to be expected from their economic role." In re Cox, 3 Cal. 3d 205, 212 (1970). Subsection 51.5 (a) provides, "No business establishment of any kind whatsoever shall discriminate against …. Any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51."

151.   The Unruh Civil Rights Act applies to Nike Retail, whose store was managed by Defendant Magee, and prohibits the kind of racially-motivated discrimination suffered by Plaintiffs on July 5, 2019. On that day, Defendant Magee, acting at all times within the scope of her employment at Nike Retail, refused to provide equal access to Nike Retail's products and services on account of Plaintiffs' race by following, harassing, defaming, accosting, assaulting, and accusing them of stealing a duly purchased basketball.

152.   The Unruh Civil Rights Act also applies to Nike, Inc. At least one Nike

1  Retail employee complained to Nike, Inc. about Defendant Magee's racial bias towards
2  and racial profiling of Black patrons and employees. Nike, Inc. failed to respond to those
3  complaints and failed to prohibit the racially-motivated discrimination suffered by
4  Plaintiffs on July 5, 2019.

5       153.   As a proximate result of the foregoing wrongful acts of Defendants,
6  Plaintiffs have suffered and will continue to suffer both physical and emotional injuries,
7  including, but not limited to, stress, humiliation, and anxiety, as described in detail in
8  paragraphs 13-125, *supra*.

9       154.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby
10  justifying an award of punitive damages against Defendants in an amount adequate to
11  punish the wrongful conduct alleged herein and to deter such conduct in the future.

12  **FIFTH CAUSE OF ACTION**
13  **Cal. Civ. Code § 51.7 – Ralph Act**
14  **(Plaintiff Joel Stallworth Against All Defendants)**

15       155.   Plaintiffs reallege and incorporate by reference each and every allegation
16  contained above as though fully set herein.

17       156.   On or about July 5, 2019, Defendant Magee, in the course of her
18  employment at Nike Retail and as an outgrowth of it, intimidated Mr. Stallworth, by
19  threat and acts of violence, because of his race.

20       157.   Employees complained to Nike about Defendant Magee's racial bias
21  towards and racial profiling of Black patrons and employees. Nike failed to respond to
22  those complaints and failed to prohibit the racially-motivated discrimination and any
23  intimidation, threats, or acts of violence suffered by Plaintiffs on July 5, 2019.

24       158.   Plaintiffs are informed and believe and thereon allege that Defendant Magee
25  assaulted Mr. Stallworth on multiple occasions, engaged in menacing and threatening
26  conduct, accused him of criminal activity, ran after him, falsely imprisoned him, and
27  attempted to snatch items from his hands, including a basketball and a paper receipt, and
28  engaged the inherently coercive power of the SMPD to detain Plaintiffs.

THIRD AMENDED COMPLAINT
FOR DAMAGES

159.   As alleged herein, the actions of SMPD officers in unlawfully detaining Plaintiffs and slanderously accusing Mr. Stallworth of theft without evidence, reasonable suspicion, or probable cause, as joint tortfeasors in conspiracy with all Defendants, further support Plaintiffs' claims under this Act against all Defendants, and indeed are sufficient to independently support the same.

160.   The foregoing wrongful acts and failures to act of all Defendants caused Ms. Dickerson, who was holding S.S. in a sling on the front of her body, to start toward Mr. Stallworth in order to defend him from assault, thus exposing her and S.S. to the assault and intimidation thereof.

161.   In addition, Defendant Nike Retail is vicariously liable because Defendant Magee's conduct occurred within the scope of and during the regular course of her employment at Nike, as she was acting as an employee attempting to recover a duly purchased basketball on behalf of Nike. Defendants Nike, Inc. and Does 2-10 are also liable as entities that exercises sufficient control over Nike Retail.

162.   As a proximate result of the foregoing wrongful acts of Defendants, Plaintiffs have suffered and will continue to suffer both physical and emotional injuries, including, but not limited to, stress, humiliation, and anxiety, as described in detail in paragraphs 13-125, *supra*.

163.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## SIXTH CAUSE OF ACTION

### Assault

### (Plaintiff Joel Stallworth Against All Defendants)

164.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

165.   Defendant Magee acted, intending to cause harmful or offensive contact with Mr. Stallworth, and threatened to touch him in a harmful or offensive manner.

166.   Mr. Stallworth reasonably believed that he was about to be touched in a harmful or offensive manner, and it reasonably appeared to him that Defendant Magee was about to carry out her threats.

167.   Mr. Stallworth did not consent to Defendant Magee's conduct.

168.   Defendant Magee's conduct was a substantial factor in causing Mr. Stallworth's harm.

169.   Defendant Nike Retail is vicariously liable for the actions of Magee, who was its employee and agent at all times relevant herein. Defendants Nike, Inc. and Does 2-10 are also liable as entities that exercises sufficient control over Nike Retail.

170.   As a proximate result of the foregoing wrongful acts of Defendants, Mr. Stallworth has suffered and will continue to suffer both physical and emotional injuries, including, but not limited to, stress, humiliation, and anxiety, as described in detail in paragraphs 13-125, *supra*.

171.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against all Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**SEVENTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**(All Plaintiffs Against All Defendants)**

172.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

173.   Mr. Stallworth was followed, harassed, accosted, and assaulted by Defendant Magee, on account of his race, all while Ms. Dickerson and S.S. were mere feet away. The conduct of Defendant Magee was plainly outrageous.

174.   Defendant Magee and engaged in these acts against Mr. Stallworth in front of Ms. Dickerson and S.S. with reckless disregard to the emotional distress that they would experience and with the intent that all three Plaintiffs would suffer emotional distress as a result of her actions. This was exemplified by her baseless accusations and

the racist reasoning that underlaid her aggressive behavior.

175.   As alleged herein, the actions of SMPD officers in unlawfully detaining Plaintiffs and slanderously accusing Mr. Stallworth of theft without evidence, reasonable suspicion, or probable cause, as joint tortfeasors in conspiracy with all Defendants, further support Plaintiffs' claims for Intentional Infliction of Emotional Distress against all Defendants, and indeed are sufficient to independently support the same.

176.   As a result of this incident, Plaintiffs have suffered significant mental anguish and trauma as described in detail in paragraphs 13-125, *supra*. Mr. Stallworth has since suffered from symptoms of post-traumatic stress disorder, depression, anxiety, and fear, which has significantly affected his daily functioning. S.S. began having trouble sleeping at home and struggled at daycare. Ms. Dickerson developed symptoms of depression, anxiety, and fear which have significantly affected her daily functioning.

177.   Defendant Nike Retail is vicariously liable for the actions of Defendant Magee, who was its employee and agent at all times relevant herein. Defendants Nike, Inc. and Does 2-10 are also liable as entities that exercises sufficient control over Nike Retail.

178.   The acts and failures to act as alleged herein caused severe anxiety, pain, suffering, and emotional distress and injury to Plaintiffs and they are therefore entitled to damages in an amount to be proven at trial.

179.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## EIGHTH CAUSE OF ACTION

### Cal. Civ. Code § 46 – Slander

### (Plaintiff Joel Stallworth Against All Defendants)

180.   Plaintiffs reallege and incorporate by reference each and every allegation contained above as though fully set forth herein.

181.   On a crowded promenade in Santa Monica's core shopping district,

Defendant Magee repeatedly accused Mr. Stallworth of a crime, to wit, theft of a basketball. She said, "You need to return that stolen ball!" Upon her returning with the police, another crowd gathered to witness and record the spectacle, and she repeated her lies in front of them. The SMPD Officers parroted Defendant Magee's lie, stating, "Give her the stolen ball." Mr. Stallworth is a business owner whose income comes primarily from word-of-mouth clientele.

182.    Plaintiffs are informed, believe, and thereon allege that Khalil, who did not observe Mr. Stallworth purchase the ball during their time in the store, was present when these slanderous statements were made and heard each of them.

183.    Defendant Magee's accusations were demonstrably false. Mr. Stallworth had purchased the basketball, which was proven after he was forced to hand over the receipt.

184.    Even if she believed them to be true, Defendant Magee's accusations were unreasonable. She did not ask the employee who processed Mr. Stallworth's purchase whether he had indeed sold Mr. Stallworth the ball.

185.    Defendant Magee, by accusing Mr. Stallworth of theft based on her racial biases, was at the very least negligent to the likelihood that her statements were false.

186.    Defendant Magee's acts and failures to act as alleged herein caused severe anxiety, pain, shame, mortification, suffering, and emotional distress and injury to Mr. Stallworth, as described in detail in paragraphs 13-125, *supra*. Moreover, Defendant Magee's acts and failures to act caused harm to Mr. Stallworth's good name, reputation, prominence, and good standing both professionally and in the community at large. As a result, Mr. Stallworth is entitled to damages in an amount to be proven at trial.

187.    Defendant Magee's conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against Defendants in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

188.    Defendant Nike Retail is vicariously liable for the actions of Defendant Magee, who was its managerial employee and agent at all times relevant herein.

Defendants Nike, Inc. and Does 2-10 are also liable as entities that exercises sufficient control over Nike Retail.

## NINTH CAUSE OF ACTION

### False Imprisonment

### (Plaintiff Joel Stallworth Against All Defendants)

189.    Plaintiffs were wrongfully confined and detained by Defendant Magee.

190.    Defendant Magee intentionally deprived Plaintiffs of their freedom of movement by the use of physical barriers, fraud and deceit, as she placed herself as a physical barrier to their movement when she accused them of stealing the basketball, and again thereafter by fraudulently and deceitfully telling the SMPD officers that Plaintiffs had stolen the basketball, resulting in Plaintiffs' detention by the SMPD officers.

191.    The SMPD officers' detention of Plaintiffs was made pursuant to an agreement with shopkeepers in and around the Third Street Promenade, including Defendants Nike Retail and Magee, whereby SMPD detains all individuals shopkeepers accuse of theft or against whom shopkeepers make citizens arrests or detentions. This agreement substitutes the judgment of private parties for the SMPD's own authority as SMPD simply carries out the shopkeepers' directions.

192.    Both instances of confinement and detention of Plaintiffs compelled Plaintiffs remain on the Santa Monica Promenade for an appreciable time.

193.    Plaintiffs did not knowingly or voluntarily consent to this confinement.

194.    Plaintiffs were harmed by this confinement.

195.    Defendant Magee's conduct in lying to the SMPD officers about Plaintiffs' conduct was a substantial factor in causing this harm.

196.    Defendant Nike Retail is vicariously liable for the actions of Defendant Magee, who was its employee and agent at all times relevant herein. Defendants Nike, Inc. and Does 2-10 are also liable as entities that exercises sufficient control over Nike Retail.

197.    The acts and failures to act as alleged herein caused severe anxiety, pain,

1  suffering, and emotional distress and injury to Plaintiffs and they are therefore entitled to

2  damages in an amount to be proven at trial.

3      198.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby

4  justifying an award of punitive damages against all Defendants in an amount adequate to

5  punish the wrongful conduct alleged herein and to deter such conduct in the future.

6  **TENTH CAUSE OF ACTION**

7  **Negligent Supervision and Retention**

8  **(All Plaintiffs Against Defendants Nike Retail, Nike, Inc., and Doe Defendants 2-9)**

9      199.   Plaintiffs reallege and incorporate by reference each and every allegation

10  contained above as though fully set forth herein.

11      200.   Defendant Magee's wrongful acts and failures to act against Plaintiffs were

12  a direct and proximate result of Nike's negligence in hiring, supervising, and/or retaining

13  Defendant Magee.

14      201.   Defendant Magee's unfitness for employment was clear from her prior

15  instances of discrimination against employees and customers of color, which were

16  communicated to Defendant Magee's supervisors pursuant to Nike's own policies, as

17  described *supra* at paragraphs 15-22.

18      202.   Defendant Magee's unfitness for employment became known or should have

19  become known, to Nike well before her racist acts and failures to act against Plaintiffs.

20  Specifically, beginning years before the incident that is the subject of this lawsuit,

21  employees of Defendant Nike Retail who worked under Magee complained to Nike

22  Retail, Nike, Inc., and Doe Defendants 2-10 about her racial profiling of employees and

23  customers on multiple occasions. These brave employees submitted written complaints

24  and complained through Nike's employee hotline. These complaints were made in

25  accordance with Nike's Code of Conduct, which clearly states that Nike "takes all

26  allegations of misconduct or other wrongdoing seriously and will investigate them

27  thoroughly."

28      203.   As a result of these complaints, Nike knew or should have known that hiring

THIRD AMENDED COMPLAINT
FOR DAMAGES

and/or retaining Magee created a particular risk that Magee would engage in the tortious and illegal conduct alleged herein. This is so because pursuant to Nike's own policies on investigating complaints of wrongdoing, Magee's supervisors knew or should have known of same beginning at least two years before the incident that is the subject of this lawsuit. These supervisors include a Chief Human Resources Officer, several Directors of Diversity and Inclusion, a Global Employee Relations Director, a Vice President and General Manager, several Regional District Directors, Regional Store Director, Loss Prevention Managers as well as numerous Nike Store Lead Managers.  Each of these individuals were in supervisorial positions over Magee and had, or at a minimum should have had prior knowledge of Defendant Magee's propensity to engage in the wrongdoing alleged herein.

204.   Defendant Magee's unfitness for employment, which was known or should have been known to Nike at all times relevant herein, created a particular risk to customers of color, including Plaintiffs, that they would be subjected to her racist and actionable behavior.

205.   Despite repeated notice of Magee's racially biased and motivated conduct, Nike failed and refused prior to the incident alleged herein to: provide any or adequate training to Magee regarding anti-bias, anti-racism and racial profiling policies, practices and procedures or to enforce any such training given; adequately investigate complaints made by employees and/or customers regarding Magee's conduct; adequately monitor and supervise her; adequately ensure that employees who made complaints concerning Magee's conduct were not retaliated against; embark on corrective action and disciplinary measures regarding her, up to and including termination; or to take other measures to adequately protect employees and members of the public from Magee's unlawful, racially biased and motivated conduct.

206.   The acts and failures to act as alleged herein caused physical and emotional injuries to Plaintiffs, including but not limited to severe anxiety, pain, suffering, and emotional distress and injury to Plaintiffs, as described in detail in paragraphs 13-125,

1    *supra*, and Plaintiffs are therefore entitled to damages in an amount to be proven at trial.

2                                  **PRAYER FOR RELIEF**

3         WHEREFORE, Plaintiffs pray for the following relief:

4         1.      For compensatory, general, and special damages against each Defendant,

5    jointly and severally, amounts to be proven at trial;

6         2.      Punitive and exemplary damages against Defendants Nike Retail, Magee,

7    Nike, Inc., and Does 2-10, in an amount appropriate to punish Defendant(s) and deter

8    others from engaging in similar misconduct;

9         3.      Prejudgment interest;

10        4.      For costs of suit and reasonable attorneys' fees and costs as authorized by

11   statute or law;

12        5.      For restitution as the Court deems just and proper;

13        6.      For such other relief, including injunctive and/or declaratory relief, as the

14   Court may deem proper.

15                                **DEMAND FOR JURY TRIAL**

16        Plaintiffs hereby demand trial by jury in this action.

17

18   Dated: April 22, 2021                Respectfully Submitted,

19                                         HADSELL STORMER RENICK & DAI LLP

20

21                                   By    /s/ - David Clay Washington

22                                         Barbara Enloe Hadsell
                                           Dan Stormer
23                                         David Clay Washington
                                           Hanna Chandoo
24                                   Attorneys for Plaintiffs

25

26

27

28

THIRD AMENDED COMPLAINT
FOR DAMAGES                          - 50 -